875 P.2d 1310

**HOME BUILDERS ASSOCIATION OF CENTRAL ARIZONA, a non-profit Arizona corporation; for and on behalf of all similarly situated; Grupe Development Co., Inc., an Arizona corporation; Knoell Bros. Construction, Inc., an Arizona corporation; Marlborough Development Corporation, an Arizona corporation, Plaintiffs–Appellees,**

v.

**CITY OF SCOTTSDALE, a municipal corporation, Herbert R. Drinkwater, Rene Wendell, James D. Bruner, Kathryn Campana, Myron R. Deibel, William Soderquist, and Bill Walton, members of the City Council of the City of Scottsdale, Defendants–Appellants.**

No. 1 CA–CV 92–0210.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 26, 1993.

Review Granted and Remanded July 6, 1994.

Carmichael & Powell, P.C. by Ronald W. Carmichael, Sid A. Horwitz, Brian A. Hatch, Phoenix, for plaintiffs-appellees.

Richard W. Garnett III, Scottsdale City Atty., Scottsdale, and Johnston, Maynard, Grant & Parker by Charles J. Adornetto, Phoenix, for defendants-appellants.

Shelley & Bethea by J. LaMar Shelley, Mesa, for amicus curiae League of Arizona Cities and Towns.

## OPINION

WEISBERG, Judge.

The City of Scottsdale appeals from a trial court ruling that Scottsdale Ordinance 1940, imposing a water resource development fee upon new developments, violates Ariz.Rev. Stat.Ann. ("A.R.S.") section 9–463.05. Because we hold that a municipality's factual determination should be upheld unless clearly erroneous, arbitrary, and wholly unwarranted, we reverse the trial court and, for other reasons discussed below, remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

In 1980, the Arizona Legislature passed the Groundwater Management Act ("Groundwater Code"). See A.R.S. §§ 45–401 to 704 (1987 & Supp.1992). The Groundwater Code requires municipalities to work toward achieving "safe yield," a long-term balance between the annual amount of groundwater withdrawn and the annual amount of natural and artificial groundwater recharge. Id. §§ 45–561, –562. Municipalities are required to provide an "assured water supply" before approving new development. Id. § 45–576(B). "Assured water supply" means that sufficient groundwater or surface water and appropriate delivery facilities will be continuously available to satisfy the water needs of all new development for 100 years. Id. § 45–576(L). Cities, including Scottsdale, with allocations of Central Arizona Project water are deemed to have an adequate water supply until December 31, 2000. Id. § 45–576(I). After that time, the director of water resources may find that the city does not have an assured water supply. Id.

In 1985, the Scottsdale city staff formulated a water resource plan. Based on the mandate of the Groundwater Code, the planners projected population growth, water demand, potential future sources, and potential financing for future sources. The planners proposed several new water sources including (1) transportation of water from Planet Ranch, a piece of land in La Paz and Mohave Counties that has renewable water rights to Bill Williams River, and (2) construction of a water treatment plant ("Water Factory 21") that would treat sewage effluent to a potable water standard and recharge it into the underground aquifer. To raise funds for these potential sources, the planners recommended the imposition of a water resource development fee upon new developments.

In 1987, the Scottsdale City Council passed Ordinance No. 1940 ("the ordinance") codifying the plan's recommended water resource development fee ("the fee"). The ordinance assessed a fee of $1,000 per single family unit, $600 per dwelling unit in a multifamily dwelling unit, and, for other uses, $2,000 per acre/foot of estimated annual use required in addition to the present annual use. These amounts were calculated after considering the new water resources' estimated costs and the projected growth and water usage in Scottsdale.

Shortly after the ordinance took effect, Home Builders Association of Central Arizona ("HBA"), representing several developers who had paid the development fee under protest, filed a complaint claiming that the ordinance was void. HBA alleged that the fee did not offset costs associated with providing necessary public services to the developments, that the fee did not result in a beneficial use to the developments, that the fee did not bear a reasonable relationship to any burden imposed upon Scottsdale, and that the fee discriminated against new homebuilders and new residents.

HBA subsequently filed a motion for summary judgment contending that the statutory

authority for development fees limited municipalities to the payment of costs of improvements that would actually and immediately accrue to the benefit of the new residents. Scottsdale filed its response and a cross-motion for summary judgment. The trial court granted partial summary judgment for Scottsdale, ruling that the benefit required by the statute need not accrue immediately.

Following trial, the trial court found that the ordinance failed to meet the statutory requirements because (1) any benefit received by new development resulting from the fee was too remote in time and speculative in nature, (2) the fee did not bear a reasonable relationship to the burden imposed on Scottsdale by new development, and (3) the fee discriminated against new developers. The trial court ordered Scottsdale to refund all fees collected under the ordinance.

Scottsdale subsequently amended the ordinance, adding a "refund" provision requiring Scottsdale to refund the fees if not appropriately spent within ten years from the date the fee was paid. Scottsdale filed a motion for new trial under Rule 59, Arizona Rules of Civil Procedure, and a motion to amend filings under Rule 52.[1] Scottsdale contended that the amended ordinance justified a new trial. The trial court denied the motions and entered judgment in HBA's favor. This appeal followed.

1. Due to our disposition of this case, we do not address the issues of the Rule 52 and 59 motions.

2. Development fees; imposition by cities and towns

A. A municipality may assess development fees to offset costs to the municipality associated with providing necessary public services to a development.

B. Development fees assessed by a municipality under this section are subject to the following requirements:

1. Development fees shall result in a beneficial use to the development.

2. Monies received from development fees assessed pursuant to this section shall be placed in a separate fund and accounted for separately and may only be used for the purposes authorized by this section.

3. The schedule for payment of fees shall be provided by the municipality. The developer of residential dwelling units shall be required

## DISCUSSION

### A. Standard of Review

#### 1. Judicial Review of Municipal Ordinances

##### a. Mandatory Effect

A.R.S. section 9–463.05 enables municipalities to assess development fees.[2] The statute requires that the fee "*shall* result in a beneficial use to the development," that the fee "*must* bear a reasonable relationship to the burden," and that the fee "*shall* be assessed in a non-discriminatory manner." A.R.S. § 9–463.05 (emphasis added). The use of "shall" and "must" indicates the mandatory nature of these requirements. *See McDonald v. Frohmiller*, 63 Ariz. 479, 486, 163 P.2d 671, 674 (1945). Municipalities may not use fees for any purpose or in any manner that will not meet the statutory requirements. The underlying issue is whether the courts or the municipality should determine whether a fee meets these requirements when it is levied. This issue is resolved by examining the power of the courts to review policy determinations by municipalities.

##### b. Deference to Legislature on Fact Issues

The Arizona Supreme Court has adopted the rule that "courts will acquiesce in the legislative determination of all matters of fact unless it is clearly erroneous, arbitrary and wholly unwarranted." *Edwards v. State Bd. of Barber Examiners*, 72 Ariz. 108, 113, 231 P.2d 450, 452 (1951); *see also Fol-*

to pay development fees when construction permits for the dwelling units are issued.

4. The amount of any development fees assessed pursuant to this section must bear a reasonable relationship to the burden imposed upon the municipality to provide additional necessary public services to the development.

5. If development fees are assessed by a municipality, such fees shall be assessed in a non-discriminatory manner.

6. In determining and assessing a development fee applying to land in a community facilities district ... the municipality shall take into account all public infrastructure provided by the district and capital costs paid by the district for necessary public services and shall not assess a portion of the development fee based on the infrastructure or costs.

A.R.S. § 9–463.05 (1990) (amended 1991).

*som Invs., Inc. v. City of Scottsdale,* 620 F.Supp. 1372, 1375 (D.Ariz.1985) ("The courts are to interfere only when the ordinance enacted pursuant to the grant is arbitrary and unreasonable."); *City of Glendale v. White,* 67 Ariz. 231, 238, 194 P.2d 435, 439 (1948) (whether act constitutes a public purpose and method of performing act is within judgment of city council; courts will not overturn unless discretion "unquestionably abused"). The court also noted that "where an enactment bears any reasonable relationship to the end sought the courts may not substitute their judgment for the judgment of the legislature." *Edwards,* 72 Ariz. at 112–13, 231 P.2d at 452. Section 9–463.05 puts few specific restrictions on the municipality when determining what measures will meet the statutory requirements. Instead, the statute uses broad phrases: "result in a beneficial use" and "bear a reasonable relationship." A municipality should be given deference when determining whether an ordinance meets these requirements. *White,* 67 Ariz. at 238, 194 P.2d at 439.

HBA urges us to infer from the statute additional restrictions on municipalities, requiring specific plans and definite timetables before development fees would be upheld. Essentially, HBA encourages us to find requirements substantively similar to those statutorily imposed on municipalities when making special assessments. *See* A.R.S. §§ 48–571 to –619 (1988).[3] Unlike the statutory requirements for special assessments, however, the legislature has not included any specific requirements in the statutory grant for development fees. "Courts will not read into a statute something which is not within the manifest intent of the legislature as gathered from the statute itself." *State ex rel. Smith v. Bohannan,* 101 Ariz. 520, 524, 421 P.2d 877, 881 (1966). We therefore must examine the history and background of development fees to determine if the legislature intended such specific requirements.

### 2. Historical Background of Development Fees

Development fees, also known as impact fees, "are charges levied by local govern-

ments against new development in order to generate revenue for capital funding necessitated by the new development." Julian C. Juergensmeyer & Robert M. Blake, *Impact Fees: An Answer to Local Governments' Capital Funding Dilemma,* 9 Fla.St. U.L.Rev. 415, 417 (1981). Development fees allow municipalities to transfer the costs of new infrastructure required by those new developments to the new developments themselves, as opposed to funding them through general revenue. Responding to developers' challenges, different states' courts have set out various standards for determining the validity of these fees. *See id.* at 427–33.

#### a. Early Restrictive Tests

Early decisions imposed restrictive standards on municipalities attempting to levy development fees. In 1960, a New York appellate court held that a town law imposing a fee in lieu of donating land for recreational purposes was an unconstitutional taking. *See Gulest Assocs., Inc. v. Town of Newburgh,* 25 Misc.2d 1004, 209 N.Y.S.2d 729, 732–33 (Sup.Ct.1960), *aff'd,* 15 A.D.2d 815, 225 N.Y.S.2d 538 (1962), *overruled by Jenad, Inc. v. Village of Scarsdale,* 18 N.Y.2d 78, 271 N.Y.S.2d 955, 957, 218 N.E.2d 673, 675 (1966). The *Gulest* court reasoned that the town law would have improperly allowed the fee to be used to support recreational programs "not directly related to the development of the subdivision." *Id.* at 732. Because the ordinance did not require that generated funds be spent directly on the new development, the *Gulest* court found the town law unconstitutional. *See id.* at 733. Commentators have named this the "direct benefit" test. *See* Juergensmeyer & Blake, *supra,* at 428.

In 1961, the Illinois Supreme Court considered the constitutionality of development fees imposed to support educational and recreational facilities. *Pioneer Trust and Sav. Bank v. Village of Mount Prospect,* 22 Ill.2d 375, 176 N.E.2d 799 (1961). The *Pioneer*

---

3. Special assessments are imposed when specific improvements are made that directly benefit a local improvement district. Before imposing special assessments, municipalities are required to have specific plans and cost estimates. A.R.S. § 48–577.

*Trust* court held that "if the burden cast upon the subdivider is specifically and uniquely attributable to [the developer's] activity, then the requirement is permissible." *Id.* at 802. Because it found that the development fees at issue were not "specifically and uniquely attributable" to the development, the Illinois court held the municipal ordinance unconstitutional. *Id.* at 803.

### b. Less Restrictive Tests

In 1965, the Wisconsin Supreme Court applied a less restrictive test to consider the validity of development fees. *Jordan v. Village of Menomonee Falls*, 28 Wis.2d 608, 137 N.W.2d 442 (1965). The *Jordan* court reasoned that the *Pioneer Trust* "specifically and uniquely attributable" test was too restrictive. The *Jordan* court held that if the municipality could "establish that a group of subdivisions approved over a period of several years had been responsible for bringing into the community a considerable number of people ... this would establish a reasonable basis for finding that the need for the acquisition [of additional facilities] was occasioned by the activity of the subdivider." *Id.* at 447. This test has been called the "rational nexus" test: municipalities must show a reasonable connection "between the need for additional facilities and the growth generated by the subdivision." Juergensmeyer & Blake, *supra*, at 431.

The *Jordan* court also found that the fees at issue were reasonable because the evidence supported a conclusion that the "expenditures are greater than the amount which has been exacted from the subdivider by way of [the development fees]." 137 N.W.2d at 449. Commentators and courts have inferred a second "rational nexus" test from this language: a municipality must "demonstrate that its actual or projected extra development capital expenditures earmarked for the substantial benefit of a series of developments are greater than the capital payments required of those developments." Juergensmeyer & Blake, *supra*, at 432 (footnote omitted). Together, these tests form the "dual rational nexus test." *Id.* at 433.

HBA correctly notes that these background cases concern constitutional challenges and therefore do not directly apply to the instant case. These cases, however, predated section 9–463.05 and are useful when considering whether we should infer specific requirements that are not expressly stated in the statute itself. Also, the Arizona statute adopts criteria very similar to the dual rational nexus test.

The enabling statute states that a fee must "result in a beneficial use" and must "bear a reasonable relationship to the burden imposed upon the municipality." A.R.S. § 9–463.05. These requirements parallel the dual rational nexus test, which requires that a fee must relate to capital improvements needed because of development and that the amount of the fee cannot exceed the proportional cost created by a subdivision's needs. *See Jordan*, 137 N.W.2d at 447, 449.

Other provisions of the statute also guarantee these results. For example, municipalities must keep the funds raised by a development fee in a separate account that can be spent only for the benefit of the developments. A.R.S. § 9–463.05(B)(2); *see Hollywood, Inc. v. Broward County*, 431 So.2d 606, 611–12 (Fla.Dist.Ct.App.1983) (earmarking fees satisfies second rational nexus test). Municipalities must also impose the fee in a nondiscriminatory manner, protecting an individual developer from having to pay more than its proportionate share among new developers. *See* A.R.S. § 9–463.05(B)(5). Considering the state of the law at the time the Arizona Legislature passed section 9–463.05, it appears the legislature adopted the less restrictive standards espoused by the dual rational nexus test. *See Bartning v. State Farm Fire & Casualty*, 162 Ariz. 48, 49, 780 P.2d 1389, 1390 (App.1988) (presumption that legislature is aware of existing case law).

Legislative history supports this conclusion. When introduced, the sponsors of section 9–463.05 proposed requiring that fees "result in a *direct* benefit." S. 1197, 35th Leg., 2d Sess. (1982) (emphasis added). As passed, the statute merely requires that the fees "result in a beneficial use." A.R.S. § 9–463.05(B)(1). The legislature chose the less restrictive language. Although not dispositive by itself, this change is evidence supporting the conclusion that the legislature did not

intend to establish overly specific requirements. *See Arizona Press Club, Inc. v. Arizona Bd. of Tax Appeals, Div. 1,* 113 Ariz. 545, 546–47, 558 P.2d 697, 698–99 (1976) (deletion from original bill in the process of enactment is weak evidence of intent of legislature).[4]

### c. Development Fees Are Not Special Assessments

Commentators note that when "applying the restrictive *Pioneer Trust* and *Gulest* tests, courts imposed the substantial requirements of a special assessment on such payment requirements." Juergensmeyer & Blake, *supra,* at 429. HBA contends that such special-assessment-like standards are required by section 9–463.05. Although agreeing that a development fee's benefits need not be as restricted to the subject development as would a special assessment's benefits, the dissent also goes on to require the same specific and definite plans that are required for special assessments.

Generally, standards governing special assessments in Arizona are set forth in sections 48–571 to –619. The specific and definite plans that the dissent argues are necessary for development fees are actually required by statute for special assessments. *See* A.R.S. § 48–577. Statutory sections governing special assessments expressly list those projects that may be funded by special assessments, *see* A.R.S. §§ 48–572 to –575, and those procedures necessary when proposing and implementing special assessments, *see, e.g.,* A.R.S. §§ 48–576, –578.

■ Development fees, however, are not the same as special assessments. The two fees have different uses and different standards. The developers in the *Jordan* case urged the application of special-assessment-like standards, similar to HBA's position in the instant case; the Wisconsin Supreme Court, however, held that development fees were not subject to such standards. 137

N.W.2d at 450. We agree. Considering the background of development fees and the statutory provisions enacted by our legislature, we will not infer more specific provisions than the legislature provided.

### 3. Deference Under A.R.S. Section 9–463.05

Because we find that the less restrictive standards approach applies to section 9–463.-05, the statutory requirements imposed on municipalities must be construed broadly. Specific plans and direct benefits are not required. The municipality need only show some rational basis for setting the amount of the fee in order to avoid it being "clearly erroneous, arbitrary, and wholly unwarranted." If the municipality can show that its plans, calculations and predictions are not "clearly erroneous, arbitrary, and wholly unwarranted," we will defer to its judgment and uphold an ordinance as satisfying the broad requirements of section 9–463.05.[5]

The dissent would apply different standards of review to the municipality's determination of the "reasonable amount" and "beneficial use" requirements. The dissent would agree that the former is within the broad discretion of the municipality, but not the latter. We find no reason for such disparate treatment.

The dissent concedes that the benefit issue is a factual question, at 14, 875 P.2d at 1319 (citing *Hensley v. Town of Peoria,* 14 Ariz. App. 581, 485 P.2d 570 (1971)), but states that deciding whether an ordinance will "result in a beneficial use" involves only a narrow statutory decision rather than broad policy or public welfare concepts under the state's police power. We disagree. We believe, as illustrated in the instant case, that a municipality's structuring of a development fee for the benefit of its residents involves a complex policy determination. In *Hensley,* this court held that both the question of benefit and method of computation are issues

---

4. This legislative history also rebuts the dissent's reading of beneficial use as requiring a "direct" benefit to the development.

5. The dissent applies a preponderance of the evidence standard and, therefore, finds that be-

cause there is evidence in the record supporting the trial court's ruling, it should be upheld. Because we give discretion to the municipality, we review the record to see if there is evidence supporting *its* judgment.

of fact, but did not address the standard to be applied by the trial court when reviewing the benefit issue. 14 Ariz.App. at 583, 485 P.2d at 572. On review after remand, this court held, and the dissent agrees, that the municipality should receive deference on the method of computation. *See Town of Peoria v. Hensley,* 26 Ariz.App. 30, 32, 545 P.2d 992, 994 (1976). In the instant case, we hold that the municipality should also receive deference on the benefit issue. In reality, the benefit determination involves policy considerations far more challenging than those involved in the cases which the dissent cites with approval. *See White,* 67 Ariz. at 238, 194 P.2d at 439 (determination of public purpose is within discretion of municipality).[6]

The dissent's suggestion that the trial court should apply a preponderance of the evidence standard to the question of whether an ordinance will result in a "beneficial use," *see* at 15, 875 P.2d at 1320, would result in substituting the trial court's judgment for that of the municipality. Such a result would violate case law and thwart good policy. A municipality has the personnel and expertise to consider matters concerning acquisition of water supplies and its effect on current and future residents. The trial court, therefore, ought to give due deference to a municipality's policy decision.[7]

The dissent cites *Fluckey v. City of Plymouth,* a Michigan special assessment case, to support its distinction and its standard, but that case only stated that road widening was not conclusively beneficial. *See* 358 Mich. 447, 100 N.W.2d 486, 488 (1960). In fact, the Michigan court applied a much higher standard than the dissent indicates; the court found that the ordinance would not result in a benefit only after holding that *"no reason-able person or jury"* could find a benefit. *See id.* "No reasonable person or jury" is a far more difficult standard than the preponderance of the evidence rule suggested by the dissent. *See, e.g., Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990) (summary judgment appropriate if "reasonable people could not agree with the conclusion advanced"). The Michigan court emphasized that the "assessors, not the court, weigh the benefits, if, in truth, there are benefits to be weighed." *Fluckey,* 100 N.W.2d at 489. We read this case as supporting our holding that municipalities should be given discretion on a benefit issue.

### B. Application
#### 1. Beneficial Use

The trial court found that Scottsdale could reasonably conclude that the municipality will need new water supplies to support new development. HBA does not dispute this finding on appeal. HBA argues instead that, because Scottsdale is not proceeding in a timely manner with its planned capital projects, the fee could not benefit any new developments during the foreseeable future.

The trial court heard evidence that Scottsdale was not actively pursuing the specific projects included in its 1985 water plan. At a hearing, the trial court expressed its opinion that the Planet Ranch project would not produce water:

> [Scottsdale's] own witnesses … said … there may not be one drop of water that ever comes off Planet Ranch. In fact, there was the likelihood it would be sold, so forth. So how can you say that that $1,000 bears a relationship to anything?

---

6. The dissent attempts to distinguish the instant case and *White* by noting that the *White* court was reviewing acts of a municipality that were not mandated by either the constitution or a statute. In reality, however, the instant situation is similar to *White.* The *White* court found that, absent specific restrictions, municipalities should be given discretion to determine whether an expenditure meets the broad "public purpose" requirement of the Arizona Constitution. *See* Ariz. Const., art. 9, § 7; *White,* 67 Ariz. at 238, 194 P.2d at 439. In the instant case, section 9–463.05 imposes a broad requirement that a development fee "result in a more beneficial use."

We follow the reasoning of the *White* court and hold that the municipality has discretion to determine whether its actions meet this broad statutory directive.

7. The dissent also argues that the municipality should not be able to base its ordinance on a bare assertion that it will spend funds in accordance with the statute. We do not disagree with this position. An ordinance based on a bare assertion would be arbitrary and, thus, invalid. This conclusion, however, does not prohibit giving deference to the municipality.

... There's no immediate benefit because there's nothing coming open over here. . . .

The trial court's factual findings and legal conclusions reflect its skepticism that the proposed projects would ever come to fruition:

> [Finding of fact # 13] Any benefit that may be received by new development is so remote in time and speculative in nature, that it does not meet the statutory criteria under A.R.S. § 9–463.05.

> [Conclusion of law # 6] Any beneficial use to the development is too remote and speculative to be realized by the development in the foreseeable future.

While the trial court based its conclusion on the fact that any possible benefit is too remote and speculative in nature, as previously discussed, section 9–463.05(B)(1) does not include any "direct benefit" requirement. The municipality is not required to have specific plans that must, by necessity, yield specific results to a specific development within a given period of time before it may assess development fees. The only requirement is that the municipality has any basis for the fee that withstands the "clearly erroneous, arbitrary, and wholly unwarranted" test.

In the present case, the bases supporting Scottsdale's development fee are 1) the Planet Ranch project, 2) the Water Factory 21 project, and 3) other projects considered since the adoption of the ordinance, such as leasing water from the San Carlos Apache Tribe. In any event, the mere finding that none of these plans are currently being implemented is not sufficient because section 9–463.05(B)(1) does not require a showing of immediate benefit.

## 2. Reasonable Relationship

The amount of the development fee "must bear a reasonable relationship to the burden imposed upon the municipality." A.R.S. § 9–463.05(B)(4). The trial court ruled that, because the development fee did not provide a benefit to the new developments, there could be no reasonable relationship. Thus, the trial court did not examine the reasonable relationship of the fee to the municipal burden.

Whether a fee bears a "reasonable relationship to the burden imposed upon the municipality" is a separate issue from whether a fee will "result in a beneficial use." If a development fee fails the "beneficial use" test, the trial court is correct that inquiry into whether a fee bears a "reasonable relationship" would be meaningless. But if the municipality's determination that the fee will "result in a beneficial use" is upheld, the court must independently examine the amount of the fee.

■ Again, the municipality's determination of the fee's amount should receive deference by the courts. The enabling statute does not require precision, only a "reasonable relationship." Furthermore, because the enabling statute does not require specific plans, the fact that the municipality may spend the fees on projects not originally planned does not invalidate the calculation. So long as the fee still bears a reasonable relationship to the method of obtaining the "beneficial use," the fee meets the "reasonable relationship" requirement.

## 3. Non-discriminatory Manner

■ Development fees must "be assessed in a non-discriminatory manner." A.R.S. § 9–463.05(B)(4). HBA argues that Scottsdale arbitrarily draws a line between new and old residents and, by assessing the development fee, unfairly charges new residents more for water. HBA further argues that Scottsdale fails to adequately account for the cost differences between the new and old water supplies and that Scottsdale fails to consider current available groundwater sources. Notwithstanding HBA's arguments, however, these factors determine the reasonableness of the fee's amount, not the manner in which it is imposed. Whether the fee is imposed in a non-discriminatory manner is a separate issue.

In a sense, all development fees "discriminate" between old and new developments. Development fees, by definition, will place an additional burden upon new developments. This fact alone does not indicate discrimination, and HBA has not asserted any discrimination in the way the fee is imposed except for this general allegation. HBA does not

assert that the schedule of payment unfairly allocates the costs among new developers; it simply argues that the fee as a whole is discriminatory. HBA's rationale would make the enabling statute itself a contradiction; a municipality could not impose a development fee against future developers because it would discriminate between them and past developers. Obviously, the legislature did not intend such a result when authorizing development fees. We conclude, therefore, that the ordinance does not assess the fee in a discriminatory manner.

### C. Disposition

"[T]he rule which applies to this case is that where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." *Higdon v. Evergreen Int'l Airlines, Inc.*, 138 Ariz. 163, 167, 673 P.2d 907, 911 (1983) (citing *Kelley v. Southern Pac. Co.*, 419 U.S. 318, 332, 95 S.Ct. 472, 480, 42 L.Ed.2d 498 (1974)). We hold that, given the minimal burden of proof incumbent upon the municipality and because we find sufficient evidence in the record to meet this minimal burden, the record allows only one conclusion on the following issues: Scottsdale's development fee will result in a beneficial use and it is imposed in a non-discriminatory manner. As noted above, the trial court never actually decided the issue of whether the fee bore a reasonable relationship to the burden placed on Scottsdale. The record indicates that both sides were prepared to present evidence on that issue, but the trial court decided that it was unnecessary because it had found no beneficial use. As a result, the record contains no discussion concerning the fee's amount. Because we find that the development fee will result in a beneficial use, the trial court must consider this issue. Thus, we remand the issue whether the amount of the development fee is reasonably related to the corresponding burden placed upon the municipality.

### D. Attorney's Fees

HBA filed a motion for award of attorney's fees. Because of our disposition, there is no successful party at this stage of the litigation. We therefore decline to decide the issue of attorney's fees.

### CONCLUSION

Because we conclude that the municipality's determination that its development fee will result in a beneficial use is not clearly erroneous, arbitrary, and wholly unwarranted, and that the fee is assessed in a non-discriminatory manner, we reverse the trial court in part. Because we find that the trial court did not reach the question whether the development fee is reasonably related to the burden placed upon the municipality, we remand in part.

EHRLICH, J., concurs.

GRANT, Presiding Judge, dissenting.

I respectfully dissent because I believe that the decision of the trial court should be affirmed.

I agree with the majority that deference should be afforded a municipality's determination of the reasonable amount of a development fee. I disagree with the standard of review the majority applies to the trial court's determination of a "beneficial use" to the new subdivisions. The trial court should, as was done in this case, independently review the proposed expenditure and determine if it will result in a "beneficial use" to the new developments as required by the enabling statute. To facilitate this review, plans must exist in sufficient detail to enable the trial court to reasonably conclude that the expenditure will result in a "beneficial use."

### A. Amount: Reasonable Relationship

A.R.S. section 9–463.05(B)(4) requires the following: "The amount of any development fees assessed pursuant to this section must bear a reasonable relationship to the burden imposed upon the municipality to provide additional necessary public services to the development."

The majority applies a deferential standard of review to the municipality's determination of the cost of future water supplies.

With this, I agree. How much it will cost to provide new sources of water is a question of fact involving judgments as to degree and estimates of non-verifiable factors. This type of factual determination is best resolved through the political process at the legislative level. The city council should be afforded this discretion when determining the reasonable amount of the charge. *See Town of Peoria v. Hensley*, 26 Ariz.App. 30, 545 P.2d 992 (1976) ("*Hensley II* ") (deferring to town council on the amount of benefit for a special assessment). The court should not substitute its judgment for that of the legislative body and should not overturn such a legislative finding unless it is clearly erroneous, arbitrary and wholly unwarranted. *Id.* at 32, 545 P.2d at 994; *contra Banberry Development Corp. v. South Jordan City*, 631 P.2d 899, 901 (Utah 1981) ("[The] reasonableness of the dedication or cash requirement in a particular case [is] a question of fact that must be resolved at trial."); *Hollywood, Inc. v. Broward County*, 431 So.2d 606 (Fla.Dist. Ct.App.1983).

The amount of Scottsdale's development fee is based on Planet Ranch, Water Factory 21, and other projects considered since the adoption of the ordinance, such as obtaining water from the San Carlos Apache Tribe. Using the projected costs of these projects to establish the cost of new water supplies could possibly satisfy the "reasonable relationship" requirement of the statute under the not clearly erroneous deferential standard of review.[8]

The trial court correctly refrained from reaching this issue, however, because the application of the funds to the specific projects proposed by the city violates a different element, the "beneficial use" requirement imposed by A.R.S. section 9–463.05(B)(1).

### B.  *Beneficial Use:  Standard of Review*

What constitutes a beneficial use is a question of law to be judicially determined. Whether the facts in a particular case show that a project will result in a beneficial use to a development is a question of fact that should be determined at the trial court level. *Hensley v. Town of Peoria*, 14 Ariz.App. 581, 485 P.2d 570 (1971) ("*Hensley I* "). Unlike the issue of a reasonable relationship between the burden and the fee, the beneficial use issue does not involve judgments as to degree nor weighing of non-verifiable factors. The trial court has not simply substituted its judgment for that of the municipality by reviewing a mere error in judgment on the part of the city. The question is more fundamental in nature. Simply stated, does the fee result in a beneficial use to the development charged or not?

Arizona courts addressed this issue in *Hensley I*. There the Town of Peoria assessed the plaintiffs for the installation of a sewer system which fronted their property. *Id.* at 582, 485 P.2d at 571. The plaintiffs contended that the sewer system would not benefit their property. *Id.* This court reversed a grant of summary judgment in favor of the town concluding that "[i]t is thus a factual question [for the trial court to determine] as to whether plaintiffs' property ... can at this time directly benefit from the sewer system." *Id.* at 583–84, 485 P.2d at 572–73. On remand, the trial court found that the sewer system did benefit the property. *See Hensley II*, 26 Ariz.App. at 31, 545 P.2d at 993. It was only after the trial court made this determination that we applied a deferential standard of review to the town's determination of the amount of the benefit. *Hensley II*, 26 Ariz.App. at 32, 545 P.2d at 994.

The majority cites *Edwards v. State Board of Barber Examiners*, 72 Ariz. 108, 231 P.2d

---

**8.** It is possible for a city to reasonably establish the amount of the fee based on the projected cost of projects the city never expects to implement. There are many possible ways for a city to reasonably estimate the future capital cost of obtaining new sources of water. For example, data on the cost of recent projects implemented by other cities could be reviewed to determine an average range of expense. Then, by estimating the projected growth of the city and through application of accounting techniques, the future cost to the city could be projected and this could be related to the per residence development fee charged. Even though the actual project eventually implemented to provide new sources of water would be entirely different than any of the projects studied to develop a basis for the amount of the fee, the fee could possibly withstand a deferential review.

450 (1951), *Folsom Investments, Inc. v. City of Scottsdale*, 620 F.Supp. 1372 (D.Ariz.1985), and *City of Glendale v. White*, 67 Ariz. 231, 194 P.2d 435 (1948), for the proposition that the legislative determination of the existence of a beneficial use to the subdivision should be given great deference. The majority interprets these cases as requiring a court to offer great deference to all legislative findings of fact. Such a broad and generalized interpretation should be avoided.

*Edwards* and *Folsom* involved challenges to an exercise of police powers which requires that the action reasonably tend to secure the public health, safety or general welfare. *Edwards* involved a challenge to a regulation establishing a minimum charge for a hair cut and *Folsom* involved a challenge to a land use zoning restriction.

*White* involved a challenge to a city's expenditure of funds for membership dues in the Arizona Municipal League. The issue was whether the expenditure was for a "public purpose." Central to the court's holding, giving deference to the legislative determination of "public purpose," was the absence of any constitutional provision or law forbidding such action by the city. *White*, 67 Ariz. at 238, 194 P.2d at 439. In the case at bar, a statutory restriction on the city's action does exist and the issue is whether the city's action comes within this restriction. Therefore the holding in *White* should not be applied.

The issue presented in this case does not involve the broad concept of "public welfare" or "public purpose," but is much narrower: will the city's expenditure of funds in the manner proposed reasonably result in a beneficial use to the new subdivisions? This question does not require determinations of policy or weighing of benefits to the general public as the police power issue does. Therefore *Edwards, Folsom* and *White* are inapposite. The legislative determination of beneficial use need not be given the same deference as in the police power cases. *See Hensley I*, 14 Ariz.App. at 583–84, 485 P.2d at 572–73.

The Michigan courts have used this less deferential standard of review in the context of special assessments for street improve-ments. *Fluckey v. City of Plymouth*, 100 N.W.2d 486 (Mich.1960). Deference is afforded legislative findings on the issue of the amount of benefit but not for the more fundamental question of *whether a benefit exists* as opposed to a detriment. *Id.* at 489. The Supreme Court of Michigan reasoned that in an earlier time almost any possible improvement to a street was automatically a benefit to the abutting properties. *Id.* In modern times, this is no longer the case. Under some circumstances, such as changing a small residential lane into a major arterial highway, the abutting properties may in fact experience a detriment as opposed to a benefit. *Id.* I consider this view to be well reasoned, although I recognize this modern approach is the minority view. *See* Wade R. Habeeb, *Widening of City Street as Local Improvement Justifying Special Assessment of Adjacent Property*, 46 A.L.R.3d 127 (1972). The Michigan approach parallels existing Arizona case law. *See Hensley I*, 14 Ariz. App. at 583–84, 485 P.2d at 572–73.

In this case, at trial the plaintiff established by a preponderance of the evidence that the proposed expenditure will not reasonably provide a beneficial use to the new development. On appeal, this court is bound by the trial court's finding of this fact unless it is demonstrated to be clearly erroneous.

### C. *Plan*

The majority correctly points out that the statutory requirements for plans and specifications imposed on special assessments are not present in the context of development fees. This does not mean the municipality may proceed without *any* plans other than its mere allegation that plans exist. Rather, the only implication is that the plans may not require the same level of specificity and detail. Plans must exist in sufficient detail for a court to determine if the proposed expenditure of funds falls within the restrictions imposed by the enabling statute. Julian C. Juergensmeyer & Robert M. Blake, *Impact Fees: An Answer to Local Governments' Capital Funding Dilemma*, 9 Fla.St. U.L.Rev. 415, 432 n. 99 (1981). The bare assertion of the legislative body that the funds will be expended in accordance with

the statute will not suffice. *See Home Builders Ass'n of Cent. Ariz. v. Riddel*, 109 Ariz. 404, 510 P.2d 376 (1973) (involving a parks and recreation facilities tax).

### D. *Benefit*

The second prong of the dual rational nexus test contains a benefit element requiring the funds to be "earmarked for the substantial benefit of a series of developments." Juergensmeyer & Blake, *supra*, at 432. Juergensmeyer & Blake give the following example:

> [W]hen the capital improvements financed by the fee requirements are remote from the particular subdivision the "benefit" requirements would not be met. For example, if no parks or playgrounds have been constructed or planned to meet the needs of the particular subdivision and none are contemplated, an impact fee for recreational facilities would not substantially benefit the development. The second rational nexus requirement would not be met.

*Id.* at 432 n. 99. This "benefit" element was incorporated into the Arizona statute by requiring that "[d]evelopment fees shall result in a beneficial use *to the development.*" A.R.S. § 9–463.05(B)(1) (emphasis added).

I agree with the majority that "beneficial use" calls for a less restrictive test than would be required for special assessments. In the context of special assessments the improvement must not be "one of practically equal benefit for the entire city." *Mosher v. City of Phoenix*, 39 Ariz. 470, 480, 7 P.2d 622, 626 (1932). For example, a sewer system that is declared a benefit to the whole community cannot be financed by special assessment. *City of Globe v. Willis*, 16 Ariz. 378, 146 P. 544 (1915). Conversely, if expansion of a sewer plant was necessitated by new residential developments, a development fee could be imposed on the new subdivisions to finance the expansion of the facility so long as it results in beneficial use to the subdivision, even though the new facility would also benefit the entire city equally.

The benefit to be conferred under a fee as opposed to a tax has been discussed in *Stewart v. Verde River Irrigation & Power Dist.*, 49 Ariz. 531, 68 P.2d 329 (1937).

A tax is imposed upon the party paying it by mandate of the public authorities, without his being consulted in regard to its necessity, or having any option as to its payment. The amount is not determined by any reference to the service which he receives from the government, but by his ability to pay, based on property or income. On the other hand, a fee is always voluntary, in the sense that the party who pays it originally has, of his own volition, asked a public officer to perform certain services for him, which presumably bestow upon him a benefit not shared by other members of society. We think it is clear that the payment which plaintiff is seeking to recover is in no sense a tax, but is rather a fee. In the first place, the necessity of its payment does not arise unless and until the individual request [sic] the public authority to perform some particular service. So long as the service is not asked, the money will never be demanded. In the second place, the service which is requested of the defendant is one which obviously and admittedly will confer a particular benefit on plaintiff alone, and upon no other person, natural nor artificial.

*Id.* at 544–45, 68 P.2d at 334–35.

In *Kyrene School Dist. No. 28 v. City of Chandler*, 150 Ariz. 240, 722 P.2d 967 (App. 1986), on facts closer to the present case, this court took a somewhat softer view toward the benefit requirement. The rigid language of "benefit not shared by other members of society" and "benefit on plaintiff alone, and upon no other person, natural nor artificial" was rejected. "[W]e do not interpret *Stewart* as setting forth an inflexible guide by which a tax and a fee are measured. Since broad general concepts are involved, it would be virtually impossible to set forth a rigid definition of a tax and a fee." *Id.* at 243, 722 P.2d at 970. *Kyrene School District* involved a challenged wastewater system development fee slated to finance expansion of the city's water and sewer system under a council approved five-year wastewater capital improvement program and a water and wastewater system master plan. This court held that the charge satisfied the benefit requirement because the school district was receiving the

overall benefit of the water and wastewater systems in exchange for the system development charges. *Id.*

The present case is analogous to *Kyrene School District* in the sense that, if the funds were spent to upgrade the capacity of Scottsdale's water system, this would benefit the new subdivisions and meet the benefit requirement of the statute.

### E. *Use*

In addition to the requirement that the fee result in a benefit, the fee must also result in a "use" to the development. A.R.S. § 9-463.05(B)(1). This element is specifically included in the enabling legislation but the majority relegates it to obscurity and seems to completely overlook the impact of this term.

The word "use" has been subjected to differing interpretations. The words of a statute should be given their ordinary meaning unless it appears from the context that a special meaning was intended. *Mid Kansas Federal Savs. & Loan Ass'n of Wichita v. Dynamic Dev. Corp.*, 167 Ariz. 122, 128, 804 P.2d 1310, 1316 (1991). If possible, courts should give meaning to all the language used in a statute and avoid an interpretation that renders a term duplicative or meaningless. *Wiseman v. Arizona Highway Dep't ex rel. Campbell*, 11 Ariz.App. 301, 303, 464 P.2d 372, 374 (1970). In the context of reviewing an exercise of eminent domain the word "use" has been held to mean simply "benefit." *Citizens Utils. Water Co. v. Superior Ct.*, 108 Ariz. 296, 299, 497 P.2d 55, 58 (1972). Utilizing this interpretation in the context of A.R.S. section 9-463.05 would render the word duplicative and meaningless: the fee shall result in a *beneficial benefit* to the development. The legislature must have intended a more traditional definition of the word "use" such as "the act or practice of employing something." Webster's Ninth New Collegiate Dictionary (1984). Under this interpretation of the statute, the fee must result in the development directly employing something to its benefit.

Scottsdale's plan is almost nonexistent. The trial court found that the projects conceptually described in the plan are most likely not going to produce water. The trial court heard extensive testimony on this issue and reasonably concluded that there would be no beneficial *use* to these developments for the foreseeable future. Since there is. ample evidence in the record to support this finding, the trial court's finding should be upheld. Absent a beneficial use to the development, the city's imposition of a development fee to fund the proposed projects cannot be upheld on the basis of A.R.S. section 9-463.05. I would therefore affirm the trial court.